NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| TONY MICKENS, | **Hon. Dennis M. Cavanaugh** |
| Plaintiff, | **OPINION** |
| v. | Civil Action No. 07-CV-6148 (DMC) |
| LOWE'S COMPANIES, INC., | |
| Defendant. | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Defendant Lowe's Companies, Inc. ("Defendant" or "Lowe's") for summary judgment. Plaintiff Tony Mickens ("Plaintiff") asserts a claim against Defendant, his former employer, for failure to accommodate his disability in violation of the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1 et seq (NJLAD). This Court has jurisdiction under 28 U.S.C. §1332. No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons discussed below, Defendant's motion is **granted**.

I. **BACKGROUND**[1]

Plaintiff began his employment as a stocker on the night shift at Lowe's in 2002. On January 17, 2005, he injured his lower back while working. To accommodate Plaintiff's back injury, Defendant temporarily assigned him to a light duty position as a greeter on the day shift. Plaintiff held this position for approximately six months, until July 2005. In July 2005, he was reassigned

---

[1] The facts set forth in this Opinion are taken from the parties' moving papers.

to the night stocker position with modified duties (e.g., lifting restrictions).[2]

Plaintiff did not recover as quickly as initially anticipated. In May 2005, Plaintiff consulted with Dr. Mitchell Steinway, who diagnosed him as having a small disc herniation, and recommended that he remain on light duty. In August 2005, Dr. Steven G. Dorsky, a doctor hired to conduct an independent medical examination, concluded that Plaintiff should undergo physical therapy. Dr. Dorsky concluded that after therapy Plaintiff would be able to return to work uninhibited. Nevertheless, Plaintiff's back pain persisted. In October 2005 he consulted with a spinal surgeon, Dr. Marc A. Cohen, who recommended surgery to address Plaintiff's back pain. On October 24, 2005, Dr. Cohen performed the operation.[3] Plaintiff was given a four-month leave of absence, from October 17, 2005 to February 9, 2006, to undergo surgery and a rehabilitation program.

Upon returning to work in February 2006, Plaintiff was assigned to the night shift. Plaintiff still had significant medical restrictions. His injury limited his ability to lift, bend, stand and walk for extended periods of time. These limitations, and their severity, varied throughout his time of employment at Lowe's. Accordingly, Defendant gave Plaintiff modified duties in an effort to conform his work assignments to his medical restrictions. Plaintiff was limited to "light duty," and was explicitly told to work within his restrictions. Light duty included sorting and stocking lightweight items, clean-up, inventory replenishment and organizing shopping carts.

Despite the modified assignments, Plaintiff was occasionally unable to complete certain

---

[2] Although the parties dispute the precise date on which Plaintiff was reassigned to the night shift, the Court will treat Plaintiff's asserted date as correct for the purposes of this summary judgment motion.

[3] Plaintiff received workers' compensation benefits after his injury. Defendant was at all times cooperative in Plaintiff's effort to obtain compensation.

tasks. In these instances, a manager would page other employees and ask them to assist Plaintiff, or instruct Plaintiff to "do what you can." When Plaintiff experienced pain that altogether prevented him from working, he would receive permission to punch out, and would wait in the break room until permitted to leave. The evidence shows that when Plaintiff felt that a particular task exceeded his medical restrictions he, reasonably, chose not to do it. Plaintiff was never disciplined for any performance limitation that was caused by his medical restrictions.[4]

Plaintiff argues that the steps taken by Defendant failed to properly accommodate his disability. Specifically, Plaintiff asserts that certain assignments exceeded his medical restrictions. For instance, he was required to: unpack pallets that were stacked too high; climb a ladder to restock certain items; unpack boxes which exceeded his lifting restrictions; engage in duties that entailed repetitive bending. Further, Plaintiff contends that Defendant failed to accommodate his disability by assigning him to the night shift. Relying on Dr. Steinway's opinion that daytime hours might alleviate some of Plaintiff's lower back pain, Plaintiff asserts that no position on the night shift could constitute a reasonable accommodation. Lowe's Human Resources manager, Paula Rubeo, was aware of Dr. Steinway's suggestion, but she did not consider the Doctor's comment regarding the night shift a work limitation. Ms. Rubeo, therefore, determined that a light duty position on the night shift was an acceptable accommodation. Defendant's store manager, Rob DaCruz, was also aware of Plaintiff's injury, and determined that Plaintiff was not suited to a position on the day shift.

In addition to Defendant's alleged noncompliance with his medical restrictions, Plaintiff also asserts that Defendant improperly failed to maintain an interactive process to determine what

---

[4] As noted below, one of Plaintiff's numerous negative performance evaluations was arguably attributable to his injury. As discussed below in Section III.B, the evaluation alone does not constitute an "adverse employment action" to support of a claim under the NJLAD.

accommodations would be appropriate for Plaintiff.

Plaintiff's employment with Lowe's ended in June 2006. On June 21, after punching out to leave, Plaintiff had an argument with Zach Holmes, a zone manager. Although the nature of the argument is disputed, it appears that Plaintiff was upset and refused to leave after being asked to do so by a manager. Soon thereafter, Plaintiff was fired. Defendant asserts that Plaintiff was terminated for using profanity on the sales floor and for being insubordinate and verbally abusive towards a supervisor.[5]

Plaintiff contends that Defendant violated the NJLAD by failing to properly accommodate his disability prior to his discharge.[6] Specifically, Plaintiff contends that Lowe's failed to (1) take reasonable steps to accommodate his medical restrictions, and (2) failed to engage in an interactive process to determine appropriate accommodations.[7]

---

[5] Plaintiff denies using profanity and contends that the reasons for his termination were pretextual, and that Defendant had an improper (i.e., discriminatory) motive for firing him. The evidence does not support such a finding. First, Plaintiff does not deny being insubordinate and argumentative. Second, there is no evidence that Defendant would terminate Plaintiff because of his disability. Defendant gave Plaintiff light duty work for well over a year, as well as four months of medical leave after his injury. In light of Defendant's efforts to work with Plaintiff–even when Plaintiff's restrictions required Defendant to substantially modify his assignments–there is no indication that he was terminated as a result of his disability. The NJLAD does not "prevent the termination … of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards." Robinson v. Hyatt Corp., 2009 U.S. Dist. LEXIS 63230, at *18 (D.N.J., July 23, 2009) (internal citations omitted).

[6] Plaintiff concedes that his temporary position on the day shift from January 2005 to July 2005 was a reasonable accommodation. He similarly accepts that his four-month leave of absence from October 2005 to February 2006 was reasonable.

[7] Plaintiff has a pending motion asking this Court to strike portions of Lowe's counterstatement of material facts and portions of Lowe's reply brief. Plaintiff asserts that Defendant has, pursuant to FED. R. CIV. P. 36, admitted to Plaintiff's requests for admissions by

## II. APPLICABLE LAW

### A. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). The moving party bears the burden of showing either (1) there is no genuine issue of fact and it must prevail as a matter of law; or (2) the non-moving party has not shown facts relating to an essential element of the issue for which he bears the burden. Celotex, 477 U.S. at 331. If either showing is made then the burden shifts to the non-moving party, who must demonstrate facts that support each element for which he or she bears the burden and must establish the existence of genuine issues of material fact. Id. The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, FED. R. CIV. P. 56(e), but must produce sufficient evidence to support a jury verdict in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The Court will consider all facts and their

---

failing to respond in a timely manner. Defendant admits that it failed to respond. The Court finds that only two of the requests for admissions were arguably relevant to the Court's decision: (1) "Lowe's did not investigate as to whether Zach Holmes behaved inappropriately during the incident that lead to [Plaintiff's] termination"; and, (2) "Lowe's had notice from [Plaintiff's] doctor that [he] was being given jobs that were outside of his medical restriction." These two admissions, however, do not compel a different result in this case. First, the specifics of Mr. Holmes behavior is not essential to a determination that Defendant permissibly terminated Plaintiff. The evidence contains testimony from a number of sources, including Plaintiff, that sufficiently describe the altercation that lead to Plaintiff's termination. There is no evidence that the termination was in any way disability-related. Second, any notice regarding Plaintiff's work limitations does not alter this Court's determination that Plaintiff's assignments were reasonably adjusted to meet his medical restrictions. See Section III.A, supra. As the Court's decision does not rely upon the evidence that Plaintiff seeks to exclude, Plaintiff's motion to strike is dismissed as moot.

reasonable inferences in the light most favorable to the non-moving party. See Penn. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

### B.     THE NEW JERSEY LAW AGAINST DISCRIMINATION

The NJLAD "prohibit[s] any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment." N.J.S.A. 10:5-4.1. Under the NJLAD, an employer "must make a reasonable accommodation to the limitations of a handicapped employee or applicant unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." Soules v. Mt. Holiness Memorial Park, 354 N.J. Super. 569, 577 (App. Div. 2002) (internal citations omitted).

In order to establish a prima facie case of disability discrimination for failure to accommodate under the NJLAD,

> a plaintiff must first present the prima facie elements required in any LAD disability discrimination claim, that is: (1) plaintiff was disabled within the meaning of the statute; (2) plaintiff was qualified to perform the essential functions of the position of employment [with or without accommodation]; and (3) plaintiff suffered an adverse employment action because of the disability.

Victor v. State, 401 N.J. Super. 596, 614 (App. Div. 2008), cert. granted, 199 N.J. 542 (2009).[8]

A plaintiff can establish the second element of a prima facie case by showing that he was able to perform the essential functions of his position, and that his employer did not reasonably accommodate him in doing so. See, e.g., Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 311 (3d

---

[8] Defendant, here, does not dispute that Plaintiff was disabled within the meaning of the NJLAD. The Court's discussion is, therefore, limited to whether Plaintiff is able to satisfy the second and third prong of his prima facie case.

Cir. 1999) (noting that, under the Americans with Disabilities Act (the "ADA"), once a plaintiff establishes a disability, "we must consider whether the [employer] failed to provide reasonable accommodations . . . to the known physical or mental limitations of an otherwise qualified individual with a disability"); Linton v. L'Oreal USA, 2009 U.S. Dist. LEXIS 25357 at *8 (D.N.J. Mar. 27, 2009) (unpublished); Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 426 (App. Div. 2001) ("[T]he phrase 'reasonable accommodation' refers to the duty of an employer to attempt to accommodate the physical disability of the employee.").

A plaintiff can also satisfy the second element of his prima facie case by showing that his employer failed to engage in an interactive process concerning appropriate accommodations. Victor, 401 N.J. Super. at 614. The interactive process under the NJLAD has been borrowed from the federal regulations under the ADA, and consists of an informal interaction between the employer and the employee to identify potential reasonable accommodations geared to the individual employee's situation. Tynan v. Vicinage, 351 N.J. Super. 385, 400 (App. Div. 2002); Victor, 401 N.J. Super. at 613. New Jersey courts have developed a four-prong test to determine whether an employer failed to engage in the interactive process. The Tynan court explained,

> [t]o show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for [his or] her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

351 N.J. Super. at 400. An employee must satisfy all four prongs of the test to demonstrate that there was no "interactive process." In successful in doing so, this will satisfy the second element of a plaintiff's prima facie failure to accommodate case.

Finally, if the first and second elements of a prima facie case for failure to accommodate are met, a plaintiff must also satisfy the third element by showing that he suffered an adverse employment action because of his disability. Victor, 401 N.J. Super. at 614.

### III. DISCUSSION

Defendant moves for summary judgment on Plaintiff's claim for failure to accommodate his disability. As explained above, Plaintiff's prima facie case requires a showing that (1) he was disabled within the meaning of the statute, (2) despite being able to perform the essential functions of the position, he was not provided with reasonable accommodations in light of his disability, and (3) he, therefore, suffered an adverse employment action because of the disability. See Victor, 401 N.J. Super. at 614. Neither party disputes that Plaintiff's back injury constitutes a disability. Defendant asserts, however, that Plaintiff cannot establish the second or third elements of his prima facie case.

#### A. PLAINTIFF'S MEDICAL RESTRICTIONS AND THE POSITION OFFERED

To satisfy the second element of his prima facie case, Plaintiff must show that Defendant failed to provide him with a reasonable accommodation in light of his disabilities, or alternatively, that Defendant failed to engage in the "interactive process" to find a reasonable accommodation. See, e.g., Linton, 2009 U.S. Dist. LEXIS 25357, at *8 (explaining that claims for "failure to engage in the interactive process and failure to accommodate [ . . . are] best analyzed as a single count with alternative arguments as to the second element of the prima facie case."); Barboza v. Greater Media Newspapers, 2008 U.S. Dist. LEXIS 55716, at *9 (D.N.J. July 22, 2008) (unpublished) ("An employer also may be liable for failing to accommodate an employee's disability by not engaging in the interactive process of finding a reasonable accommodation for the employee"). The Court

will separately consider each argument to determine whether Plaintiff can established the second element of his prima facie case.

### (1) *Reasonable Accommodation*

Defendant asserts that it made reasonable accommodations for Plaintiff in light of his disability.[9] First, after Plaintiff sustained his back injury, Defendant provided a temporary six-month transfer to a light duty position as a greeter on the day shift. Next, Defendant created Plaintiff a light duty position on the night shift (the shift to which Plaintiff was originally assigned). Then, Plaintiff was given a four-month leave of absence to undergo surgery and rehabilitation. Finally, upon returning from leave, Plaintiff was returned to the light duty position on the night shift. Plaintiff asserts that his light duty position on the night shift was not a reasonable accommodation. This Court disagrees.

Defendant asserts, and Plaintiff does not dispute, that a position was created on the night shift to accommodate Plaintiff. Plaintiff contends that this position was not a reasonable accommodation for several reasons. He argues that (i) at times the assignments required him to exceed his medical limitations, (ii) he was forced to work too quickly and without needed assistance, and (iii) night shift work, in general, was inappropriate in light of his medical restrictions.

First, Plaintiff asserts that the night shift position required him to perform activities that exceeded his bending/stooping restrictions. He points to two specific instances where the work assignments required significant amounts of bending. During September of 2005, seven months

---

[9] Defendant does not argue that Plaintiff was incapable of performing the required functions of the position. Instead, Defendant argues that the modified position that was provided to Plaintiff was a reasonable one.

after his injury, Plaintiff was given a restocking assignment that required him to repeatedly stoop to reach a lower shelf. As an initial matter, Plaintiff has not demonstrated that this assignment exceeded the medical restrictions as suggested by his doctors. See Declaration of Elizabeth Foster in Opposition to Defendants Motion for Summary Judgment ("Plaintiffs's Decl."), Ex. 5, at 375-82 (noting that Plaintiff was permitted to engage in occasional bending).[10] In any case, the particulars of the assignment are immaterial, as Plaintiff concedes that Defendant gave him a new task when he expressed difficulty with restocking. See Declaration of Amy Bashore in Support of Defendants Motion for Summary Judgment, ("Def. Cert"), Ex. D at 362; see also Jones, 339 N.J. Super. at 424 (finding that an employer complied with the NJLAD by adjusting work requirements shortly after an employee made his medical limitations known).

Plaintiff alleges that his bending restriction was violated on a second occasion. However, in this instance he simply told his manager that he was unable to perform the task, and there is no evidence that he ever faced repercussions for doing so. See Def. Cert. at Ex. D, at 326. Plaintiff cannot claim that the assignment impermissibly exceeded his medical restrictions when the evidence shows that he simply refused to do the work.

Plaintiff further asserts that certain unpacking duties as a stocker on the night shift involved handling items that exceed his lifting restrictions, were placed too high for him, and required him to climb a ladder. These assertions are insufficient to support Plaintiff's claim, as he has not provided evidence showing that at the times these tasks were assigned to him he was restricted in

---

[10] Dr. Steinway suggested that Plaintiff not engage in repetitive bending. Dr. Dorsky did not suggest mention such a limitation. Similarly, Dr. Cohen's September 29, 2005 note made no mention of a bending restriction. Even if Plaintiff was subject to bending restriction was at the relevant time period, Plaintiff admits that was permitted to use a stool or wheelchair to do his work

such activities.[11]  Even more importantly, however, Plaintiff's claim must also fail because the evidence shows that he was not required to do anything in excess of his capabilities.  See Def. Cert. at Ex. D, at 330-32; Ex. F. at 15.  When he had trouble with tasks, he was told to "do what you can do."  Id. at 336.  In instances when Plaintiff faced increased discomfort, he was permitted to rest or even leave.  Id. at 329-30.  Plaintiff's general assertion that positions on the night shift could entailed tasks beyond his medical restrictions is inapposite–the evidence shows that Defendant modified Plaintiff's job responsibilities to permit him to work within his established medical restrictions.

Second, Plaintiff's argues that he was forced to work too quickly.  Plaintiff explains that a manager regularly made store-wide announcements to employees to finish their work prior to the store's opening.  Plaintiff, however, was permitted to take breaks at regular intervals in accordance with his doctor's restrictions, and there is no evidence to suggest that his disability prevented him from completing his light duty assignments in a timely manner.  For example, he was never disciplined for failing to work at a particular pace or missing an assignment deadline.  Plaintiff's statement that he was forced to work quickly, even if taken as true, does not suggest that Defendant failed to accommodate his disability.

---

[11] Although Plaintiff generally alleges that certain bulk containers of product have exceeded his lifting capacity, he does not assert that he was required to carry them.  He was instructed to simply put the contents of the boxes into stock.  As far as climbing and reaching, Plaintiff has not shown that he was under strict limitations during the relevant times periods.  See Def. Cert. Ex. D at 384; see also Exhibits to Defendants Lowe's Home Centers, Inc.'s Reply in Support of its Motion for Summary Judgment, at Ex. G; H.  As Plaintiff recognizes, his medical restrictions were subject to change in light of his doctors' advice.  See Plaintiff's Decl., Ex. 5 at 257.  Accordingly, vague assertions regarding his inability to perform certain work assignments–without establishing that such tasks were given at a time when he was under an applicable medical restriction–do not establish that he was not adequately accommodated.

Third, Plaintiff claims that the night shift position was not a reasonable accommodation in light of his injury. Plaintiff relies on a note from Dr. Steinway advising that working during the day may help Plaintiff get rest, and in turn help with his back pain.[12] The notes from various doctors to Defendant indicate that day shift work was not a strict medical limitation. Based on the consistent limitations that were conveyed to Defendant (such as the restrictions regarding mobility and lifting), it is clear that Dr. Steinway's August 23, 2005 reference to the day shift was a mere suggestion–not a requirement. For instance, an August 22, 2005 letter from Dr. Dorsky simply states that Plaintiff requires light duty. See Plaintiff's Cert., Ex. 3. Similarly, an October 13, 2005 note from Dr. Cohen asserted that Plaintiff was capable of continuing his light duty (i.e., his work on the night shift). See Plaintiff's Cert. Ex. 4. The work limitations suggested by the various doctors did not indicate that Plaintiff was altogether restricted from working on the night shift.

Defendant hired Plaintiff for a night shift position, and then permissibly adjusted the demands of that position to accommodate his disability. Plaintiff is not entitled to provide his own "definition of accommodation . . . by contending that []he was entitled to the job of her choice–including hours and type of work." Blizzard v. Exel Logistics N. Am., Inc., 2005 U.S. Dist. LEXIS 28160, at *42-43 (D.N.J. Nov. 15, 2005) (unpublished). Dr. Steinway's isolated suggestion that the day shift may help Plaintiff with his back does not render Defendant's extensive efforts to accommodate Plaintiff ineffective.

---

[12] While day work may have been his preference, he was not restricted to working a day shift, and Lowe's was, therefore, under no obligation to place him in such a position. The parties have submitted notes from a number of physicians covering a ten-month period. Of the many physician notes submitted to this court, only one of the notes, by only one of the three doctors, suggested that "perhaps if on day shift he might feel better in terms of [lower back pain]." Def. Reply Cert. Ex. K.

-12-

In view of the evidence presented, the Court finds that Defendant reasonably accommodated Plaintiff's disability. Plaintiff admits that he was given significant leeway with his work assignments. He was permitted to take breaks or even leave if necessary. See Plaintiff's Brief at 8. Plaintiff did not do assignments that he was unable to do, and he was not disciplined when he failed to complete assigned work.[13] Plaintiff readily admits that his manager tried to follow his medical restrictions, and advised him to work within his capabilities. The evidence shows that Defendant was prepared to allow Plaintiff to work on a newly created light duty position indefinitely, even though this was not required by the NJLAD. These steps constitute a reasonable accommodation of Plaintiff's disability. See Taylor, 184 F.3d at 311 (considering whether an employer provided reasonable accommodations in light of plaintiff's disability). Plaintiff's insistence that Defendant should have offered him a position on the day shift does not render the chosen accommodation inadequate. See Jones, 339 N.J. Super. at 426 (2001) (noting that there is "not [] a duty on the part of the employer to acquiesce to the disabled employee's requests for certain benefits."). Defendant was entitled to use its discretion to provide Plaintiff with a reasonable accommodation. The Court finds that Defendant properly did so.

---

[13] Of Plaintiff's ten negative work evaluations, only one relates to poor performance as a result of his back injury. He asserts that he received the negative evaluation because the assignment exceeded his bending restriction, and he was therefore unable to complete the task. The evaluation, however, did not result in a formal disciplining or other punishment. See Def. Cert., Ex. 1. Therefore, as a mere negative evaluation does not constitute an adverse employment action, the evaluation does not support his failure to accommodate claim. See Section III.B, supra.

Plaintiff also asserts that his negative evaluations related to tardiness were disability-related. Defendant's concerns regarding Plaintiff's attendance, however, began well before his injury was sustained. Furthermore, Plaintiff simply received a warning as a result, so he did not suffer an adverse employment action. See id. Plaintiff's assertion that his disability caused his negative evaluations, then, do not support his failure to accommodate claim.

(2) *Engagement in the Interactive Process*

Plaintiff next argues that Defendant failed to reasonable accommodate him by refusing to engage in an interactive process to find an appropriate accommodation. See Linton, 2009 U.S. Dist. LEXIS 25357, at *8; Barboza, 2008 U.S. Dist. LEXIS 55716, at *9.  To establish that Defendant failed to engage in the interactive process, Plaintiff must show that

> (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

Tynan v. Vicinage, 351 N.J. Super. 385, 400-01 (App. Div. 2002).

The correspondence between Plaintiff's doctors and Defendant, as well as Defendant's communications to Plaintiff (i.e., advising him to work within his restrictions), illustrates that the parties engaged in an interactive process.   Defendant's human resources manager discussed an accommodation plan with Plaintiff.  Oscar Pratts, a store manager, similarly discussed Plaintiff's restrictions with him.  The medical limitations that Plaintiff and his doctors conveyed directly impacted the assignments he was given.  In light of this medical advice, Plaintiff was given four months of leave, and restricted-duty assignments.  When specific assignments were too strenuous for Plaintiff, he was told to "do what you can do," and permitted to take breaks as needed.  These accommodations are indicative of Defendant's response to the interactive process.  See Jones v. Aluminum Shapes, Inc., 339 N.J. Super. at 428.

In one instance where Plaintiff formally notified Defendant that an ongoing assignment was beyond his restrictions–i.e., the inventory replenishment assignment that required bending–Defendant quickly resolved the situation.  This temporary assignment, even if it was

-14-

outside of Plaintiff's restrictions, is not alone sufficient to entirely negate Defendant's long-term efforts to provide an appropriate accommodation. See Baker v. Hunter Douglas, 2008 U.S. App. LEXIS 5807, at *8 (3d Cir. N.J. 2008) (unpublished) (noting that a two-week delay in addressing Plaintiff's accommodation request does not indicate that there was a failure to engage in the interactive process). Moreover, as noted above, Defendant appears to have refused to do the assignment without facing any repercussions. Permitting Plaintiff to opt-out of an assignment that he was unable to perform is an entirely appropriate accommodation, and speaks to Defendant's receptiveness of Plaintiff's medical limitations.

Plaintiff's own testimony indicates that there was an interactive process. For instance, Plaintiff suggests that he continually had to go to his doctor to determine his medical restrictions, and that such restrictions would result in changes at work. See Plaintiff's Decl., Ex. 5 at 257.[14] He asserts that instead of constantly modifying his work assignments, it would be easier to move him to a new position. Id. Through this statement, Plaintiff essentially concedes that he continuously had his work duties modified–and expected such modifications to continue–in light of his medical restrictions. Plaintiff also acknowledges that Defendant's supervisor tried to comply with the medical restrictions communicated by the various doctors. See Def. Cert., Ex. D at 354.

Defendant repeatedly emphasizes that he would have preferred Plaintiff moved him to the day shift. He observes that the day shift position as a greeter did not conflict with his medical restrictions. During Plaintiff's meetings with various management and human resources employees, he reiterated his preference to work on the day shift. Defendant however, was under no duty to give

---

[14] As discussed below, this is merely Plaintiff's desire, not Defendant's obligation. See Jones, 339 N.J. Super. at 426.

-15-

Plaintiff the specific job or hours he sought. The fact that Plaintiff feels as though management was not making sufficient efforts to secure him a position on the day shift is inapposite. See Jones, 339 N.J. Super. at 426 (2001) (noting that there is "not [] a duty on the part of the employer to acquiesce to the disabled employee's requests for certain benefits"); see also 29 C.F.R. Part 1630, App. § 1630.9 ("[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations."). Plaintiff, as a result of an interactive process with Defendants, was given a position that was within the restrictions his doctors communicated to his employer.

The Court finds that Defendant engaged in an interactive process to determine an appropriate position for Plaintiff. This conclusion is supported by the Court's previous finding, see Section III.A.1 supra, that Plaintiff was ultimately provided with a reasonable accommodation. See Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 422-29 (App. Div. 2001) (As "substantial accommodations were made as the result of interaction, we hold that the accommodation efforts were reasonable as a matter of law."); Thorson v. PSEG Power, LLC, 2009 N.J. Super. LEXIS 273, at *6 (App. Div. Jan. 9, 2009).[15]

Defendant's communications with Plaintiff and his physicians, and the resulting work modifications, establish that the parties engaged in the interactive process in determining a

---

[15] Plaintiff relies on Gomez v. Con-Way Cent. Express Inc., 2009 U.S. Dist. LEXIS 23190 (D.N.J. Mar. 18, 2009) to support his contention that "[Defendant] refused to meaningfully respond to [Plaintiff's] requests to go back on the day shift, and refused to consider any open positions for him . . . [and therefore] cannot demonstrate good faith in engaging in the interactive process, and summary judgment must be denied." Plaintiff's Br. at 14. This Court finds comparisons to the Gomez case to be misplaced. There, the employer's attempt to accommodate its employee was focused exclusively on eventually having the employee return to his heavy duty position. Id. at *34-35. Here, Defendant had no such intentions, and Plaintiff does not contend otherwise.

reasonable accommodation for Plaintiff's disability.

Plaintiff was provided with a reasonable accommodation, after engaging in an interactive process with his employer, and, accordingly, cannot satisfy the second element of his prima facie case.

### B. ADVERSE EMPLOYMENT ACTION

Even assuming *arguendo* that Plaintiff could demonstrate that Defendant's accommodation was unreasonable, he cannot establish the third element of his prima facie case–that he suffered an adverse employment action because of his disability. Victor, 401 N.J. Super. at 614 (observing that a failure to accommodate claim requires that "plaintiff suffered an adverse employment action because of the disability"). Plaintiff asserts that he suffered an adverse employment action when (1) he was terminated for requesting assistance with work that his disability prevented him from doing, and (2) he was given a poor performance evaluation

(1) *Plaintiff's Termination*

Plaintiff can not show that he was terminated for disability-related reasons. Plaintiff asserts that on the night of his termination he requested assistance with a project, and did not receive it. See Plaintiff's Decl., Ex. 5, at 107. He told the manger no one was available to help, and the manager, in response, gave him permission to punch-out and leave work. Id. As he was exiting the building, he was involved in an altercation with a co-worker, Zach Holmes. Id. at 108. He was subsequently terminated for being involved in the altercation, and for not leaving the premises after being asked to do so several times. Plaintiff has presented no evidence linking his termination with

his disability. See id. at 108; Def. Cert., Ex. 9;[16] see also Swingle v. Novo Nordisk, Inc., 2009 U.S. Dist. LEXIS 76991, at *18-20 (D.N.J., Aug. 27, 2009) (finding that a Plaintiff cannot establish a prima facie case under the NJLAD when the alleged adverse employment action is not related to Plaintiff's disability) (emphasis added); Van de Pol v. Caesars Hotel Casino, 979 F. Supp. 308, 312 (D.N.J. 1997) (noting that a plaintiff suffers an adverse employment action when "defendant terminated him or discriminated against him because of his disability.") (emphasis added). Plaintiff has provided no evidence that his termination was related to his disability.

Additionally, as Plaintiff admits, only weeks prior to his termination he was involved in another aggressive argument with a co-worker. See Plaintiff's Decl., Ex. 5 at 346. Before that, Plaintiff had been in an altercation with a manager. Id. at 351. He had also received numerous negative performance evaluations for insubordinate or unprofessional behavior. See Plaintiff Cert., Ex. 1. These incidents further indicate that Plaintiff's termination was premised upon Defendant's disciplinary concerns, and not related to his disability.

Finally, the Court notes that in view of Defendant's behavior in accommodating Plaintiff, Plaintiff's suggestion that his termination was a result of his disability is not credible. The evidence shows a history of Defendant's efforts to comply with Plaintiff's limitations, such as offering him extended medical leave and modified "light duty" assignments. Even after Plaintiff's return to the night shift, he admits that his work responsibilities were continuously modified to remain with his current medical restrictions. Plaintiff's Cert., Ex. 5, at 257; Def. Cert. Ex. D, at 354.

Plaintiff has failed to make a prima facie showing that his termination was related to his

---

[16] Furthermore, the Court observes that Plaintiff had regularly requested assistance with projects. See Plaintiff's Cert. Ex. 12, at 27. He asserts, nonetheless, that after requesting assistance on June 21, 2009, he was punished by being terminated.

disability.

                (2) *Performance Evaluation*

Plaintiff also asserts that a negative performance evaluation that he received constitutes an adverse employment action resulting from his disability. Even if the Court accepts that the Plaintiff's poor performance was disability-related, this evaluation letter does not constitute an adverse action. See Sconfienza v. Verizon Pa., Inc., 2008 U.S. App. LEXIS 24740, at *6 (3d Cir. Dec. 5, 2008) (first step of disciplinary procedure not adverse employment action); Urey v. Grove City College, 94 F. App'x 79, 81 n.2 (3d Cir. 2004) (verbal and written warnings not adverse employment actions); Heuschkel v. McCulley, 2008 U.S. Dist. LEXIS 22143, at *11-12 (D.N.J. Mar. 19, 2008) (where a written warning could be used to support progressive discipline but was not so used, no adverse employment action); Colson v. Cablevision MFR, Inc., 2008 U.S. Dist. LEXIS 18488, at *14-15 (D.N.J. Mar. 11, 2008) (written warning not adverse employment action even though it prevented plaintiff from transferring for 4-6 months). Despite the numerous evaluations Plaintiff received over the course of his employment, his employment status never changed. As such, these mere warnings do not constitute adverse employment actions.

Plaintiff cannot establish that he suffered an adverse employment action as a result of his disability and, therefore, has not satisfied the third element of his failure to accommodate claim. Victor, 401 N.J. Super. at 614; Sconfienza, 2008 U.S. App. LEXIS 24740, at *6 (where a communication from an employer was "only a warning about future penalties, which had no adverse impact on [Plaintiff's] employment . . . [the warning] did not constitute an adverse employment action and thus summary judgment was appropriate.").

## IV.  CONCLUSION

For the reasons stated, Plaintiff cannot establish the second or third element of his prima facie case for failure to accommodate.  Accordingly, Defendant's motion for summary judgment is **granted**.

                                                          /s/ Dennis M. Cavanaugh
                                                         Dennis M. Cavanaugh, U.S.D.J.

Date:           December   14   , 2009
Original:       Clerk's Office
cc:             All Counsel of Record
                The Honorable Mark Falk, U.S.M.J.
                File